This is Sloan Pleasants v. Robert Rigsby, and we're ready, Mr. Fogle. Good morning, Your Honors. Let's just let them get out so they won't interfere with your argument. Thank you for stepping up here. Let's just let them get out. Thank you very much, Mr. Fogle. In case you missed it, good morning, Your Honors. Jeffrey Fogle appearing on behalf of the plaintiff appellant. May it please the Court, in her complaint, the plaintiff alleged in part as follows. In or about November 1st, 2009, Defendant Rigsby appeared at Ms. Pleasants' home in the town of Louisa, Virginia, along with her estranged husband, Richard Pleasants. Ms. Pleasants ordered both the officer and her husband to leave the premises. Paragraph 9, on December 13th, 2009, Defendant Rigsby, along with Richard Pleasants, again appeared at the home of Plaintiff. Paragraph 10, at that time and place, Defendant Rigsby, without consent, without just cause, entered the residence of Plaintiff and began asking questions of Plaintiff's daughter. Ms. Pleasants ordered Defendant Rigsby to leave the premises, but he refused to do so. We know what the facts are, I think. We have to judge what the officer did at the moment of the arrest, is that correct? Yes. And what information the officer had, and what he thought he knew at the time of the arrest. Absolutely. Why would a reasonable officer know that that arrest absolutely could not be made at that point? Well, I think it's pretty obvious that the nature of the physical contact here was of such to bespeak a de minimis kind of contact that is quintessentially the kind of contact that parents have on a regular basis, sometimes more, sometimes less, with their children. I'm reminded of something that I said in the first argument on this case, is if you can imagine being in a supermarket, and there's a child who wants a particular cereal that they saw on television, full of sugar, and the mother or father who's escorting them doesn't want them to have it. The child starts screaming and bawling, the way children can do that, and reaches to grab the cereal. The mother or father, whoever is accompanying them, grabs the child by the wrist, pulls them away from the shelf, and delivers a little spank on the buttocks. We have less than that in this case. In that scenario, just under those words, isn't it possible for a parent to apply too much force, both in pulling the arm back and in hitting the child? It is certainly possible, but the fact is that if you were to observe that in a supermarket, your first thought wouldn't be, that parent committed assault and battery, as I described it. Now, if you could actually visually see that it was a wrenching kind of pull. What if you didn't see it, but what if you know this to be the facts? The child is crying, sitting down in the middle of the supermarket, which children sometimes do, I'm told, and the child goes, my mother snatched my arm and really belted me on the bottom. What about that? You wouldn't have seen it, but then the officer is supposed to say what? Children, do what your parents tell you, and I don't care what you say. And an officer allowed some leeway in taking the force. Could it have been more than proper? It could have, but you would think that the officer would first try to determine why it was that the parent administered the discipline in that case. The problem, though, or one of the problems, it seems to me, is that this was not the first encounter. This was not the first time that the officers had been dispatched to the resident in response to complaints involving the treatment of the child at the request of the father. Well, that's not accurate, Your Honor. Okay. The father told the police that he'd heard the child crying in the background during a phone call and at appellant drinks. Is that not correct? In the first instance. In the first instance. Yes, sir. Yes, ma'am. Right. So that's the information that the officer has. It may or may not be correct, but it does suggest, I would posit that it would suggest to a reasonable officer that it warranted looking into. And he did. And he did. And what did he learn, though? And then he, but he came back. Again, based on, as I recall, the husband's report that the child was hysterically bawling and upset. On the phone, yes. On the phone. And the appellant simply orders them off the property. Correct. The appellant wouldn't let him talk, said the child was fine and started to close the door. But the appellant came in anyway. He came in apparently because of concern about what those circumstances suggested. Anything wrong there? Well, what's wrong, I think, is the premise as to what happened the first time. The first time that the defendant went there, he went at the request of the husband. Not because the husband claimed that he was concerned about his daughter, even though he heard her screaming and crying. But the husband related to the defendant that the daughter told him that her mother was throwing her out of the house. And he was simply going to pick her up in order to have her live at his house. And he asked the police to accompany him, not because he was concerned about his daughter, but he was concerned about being accused of intimidating his ex-wife. Okay, maybe you're answering my question and I'm just not aware of it. Well, I just think they're very different circumstances. But the circumstances are that there have been concerns expressed before about the child. And what Judge Shedd suggests is, on what side do you err in terms of allowing the police to respond? What's the margin of error for protecting the police officer under circumstances such as this, given the level of concern universally about child abuse? First, as I started to say, I have a very different take about what happened on November 1st. Because what the defendant learned when he went to the house was that the mother was not throwing the child out. Let's just say this, just assume, if you'll allow me, for the purposes of Judge Duncan's question, that when he goes the second time, the child said, she hit me and she grabbed me by the wrist and forced me out of the chair. Taking that as the facts, answer the question, what's the margin of error for an officer at that point? To do nothing? And when he, it's not just that, I guess it's even more than that. If he decides within the margin of error to do something to protect the child, and he could be absolutely wrong about it, he should know that it's absolutely established he can't take that action. That's not the law, is it? No, but the law is that a parent is privileged to use corporal punishment so long as it does not exceed the balance of moderation. I know that, but that's a point. And what we have here, Judge, is a slap on the hand. No, we have more than that. Well, that's the description that was given by the young girl. Did she say she grabbed my arm and forced me out of the chair? She pulled me by the wrist. Did she say that? Yes. It's more than a slap on the arm, then. No, she said she pulled me by the wrist because she wouldn't take a shower. It's Sunday night before school. No, no, stop for a second. You told me the only evidence was she said she hit me, a slap on the arm. That's not correct. No, I didn't mean to say that was the only evidence. I said the only evidence with respect to the striking on the hand was that there was a slap on the hand. Let's just get the record straight, and I think you and I will know it. The girl said my mother hit me, and she showed the officer what it was. It didn't seem too terrible in the record, I don't really think. But she also said she grabbed me by the wrist to force me to take a shower, pull me out of the chair, something like that, correct? Not exactly. She didn't say to force me. She said she grabbed me by the wrist and told me to take a shower because she was refusing to take a shower.  That's an unclear question because there's a dispute about precisely what she said. But the point is this. There's evidence that the mother has used some force against that child. You say clearly under the law that that's not a tort. I mean that's not a criminal violation. But the officer making that split-second decision, why is he not allowed to disagree with you on what that force means? That's my question. I guess that's the same question Judge Dunks is asking. He has to make a snap-second decision, and why is he not allowed to get it wrong? When the question of force and hit is a little bit nebulous, why isn't he allowed to err on the side of protecting the child? Well, number one, I don't think this is a close case that would make that problem a difficult one for the officer. And secondly, there are, of course, consequences. He did arrest the mother in front of the child. Clearly there were problems in the family, and that couldn't have helped. The mother then didn't get to see the child for months until this was dismissed. But those are the consequences of what he was doing. Those are questions that are later determined by the legal system, aren't they? We're talking about what the officer does in the heat of the moment. Well, the heat of the moment. There was no immediate danger to that child. There was no evidence of an immediate danger to that child. He could have called social services, had them come over and do an investigation right there. None of those are the questions. The only question is, at the time that the officer acted, was the state of the law sufficiently clear that he should have known that he had overstepped his authority? Well, I can't do any better than recite what this court said in its original opinion on this matter. And that was that based on the allegations of the complaint, because as you'll recall, Judge Moon dismissed this on a 12B6 motion. And the complaint relates, plaintiff's daughter stated that plaintiff had slapped her on her leg where her arm was resting. Plaintiff's daughter also told Defendant Rigsby that her mother grabbed her by her wrist and told her to take a shower. And those are the facts. No, those aren't the facts. That's the allegation. And didn't the previous order say that that was on a motion to dismiss? And if you don't know what grab means and what grab did, that means you have to have more information. Those aren't the facts. Wasn't that sent back to find the facts? Doesn't the opinion say that? Yes, and what did we learn? That Officer Rigsby was not at all interested in why the young woman was slapped in the car. We find out later that she started to throw a temper tantrum while her mother was driving. But he wasn't interested in that question. And in response to these allegations as to what occurred, this is what occurred. The plaintiff's daughter told him that she had been slapped on her leg where her arm was resting, and that her mother grabbed her by her wrist and told her to take a shower. We don't have any more information about the physical contact than that. I think a fair reading of that opinion might be, we just don't know. Because there's a range of what slap can mean, and there's a range of what force can mean. So we just don't know. But if the officer then looks at it, and on the facts he had with the background he has, why is it a mistake for him, why is it clear to him it's established he cannot decide that the action which is described by the word hit or slap, and the action described by the word pulled me, why can't he decide that's enough? He doesn't have to accept your meaning of what those words mean. Well, if somebody has to draw... I don't think you do it. If somebody has to draw an inference about what those words meant, and there are two reasonable inferences to be drawn, then the Toland case clearly states that's a question for a jury to decide, not for an officer to decide. But when this court looked at those allegations, it said, in the absence of more factual context for the use of force here, probable cause for the arrest was so lacking that Officer Rigsby violated her clearly established right not to be arrested without probable cause. So the question on remand was, what other factual details are there, or factual context was there for the use of this minimal force? And what we know is, in the first instance, the child's in the car screaming at her mother while it's raining and storming outside, and her mother slaps her on the wrist. What we know is that later on, several hours later, the child's on the floor yelling and screaming and telling her mother she won't take a shower, and the mother does exactly what we described in the complaint, grabs her by her wrist and told her to take a shower. There was no more harm shown beyond those allegations on the remand, and there's none in this record. The record fully supports what those allegations were. Thank you very much. Thank you. Both of you, you've served some time. Thank you. Fisher? Please, Court, Your Honor, my name is Scott Fisher. I represent Robert Rigsby. I'm overcoming some bronchitis, so I apologize if I cough at you. I think the Court has hit the issue on the head in that context matters in these sorts of things when an officer is called to. What's different about the case in front of us now compared to when it was in front of us last time? Well, for the false arrest claim, none of the context was before the Court previously. What has been added then? earlier. He was dispatched to go there again on a concern about the child. He was told at that point in time by the father that the child was upset and crying hysterically and that she was being thrown out of the home at that point. And when this Court previously upheld the lower court's granting of summary judgment on the unlawful entry claim, with respect to the November 1, 2009 incident, the Court observed that although Ms. Pleasance eventually acquiesced in the daughter leaving with her father that evening, Officer Rigsby could have reasonably viewed her shutting the door before KP, the daughter, finally reopened the door to leave his hostility and desire to keep KP. Don't read the order to us. Just talk to us about it. The point is you can't look at these things in a vacuum. Well, in the case of that prior order, the claim of the entry was based on a summary judgment decision. That is correct, Your Honor. The question of false arrest was based on a motion to dismiss. That's exactly right. And the difference is, in one, the facts have been established as to the entry case, and so this Court felt comfortable ruling on that as a summary judgment matter, correct? That's correct. And it was sent back because on the face of the complaint, the standard under 12b-6, the Court said we can't decide that the officer wins. Take it back and let's see what information. When it went back, was there any new information added? Well, all of the new information, all of the information concerning the November 1, 2009 encounter, and then once the officer was called to respond, he was dispatched to respond and meet with the father of this child again on the December 13, 2009 encounter. Based on the information we have, why do you say that the officer is entitled to qualified immunity? Well, a couple of things, Your Honor. What he's told when he goes to the residence on December 13, 2009, is that the daughter was crying hysterically, bawling and upset on the telephone. The father wanted the officer to conduct a welfare check on the child. They arrived to the residence. The mother opens the door, points at Officer Rigsby and Mr. Pleasance and said, You and you get off my property. And then she goes to begin closing the door. Mr. Pleasance said, I want to see my daughter speak to her. Ms. Pleasance responded, she's right there inside the door and she's fine. And then she began to shut the door. She didn't give the officer an opportunity to determine whether or not the welfare of this child was intact. And that was part of the reason why the Court Why does that go to false arrest, though? Well, it goes to something's going on with this child, so he gets None of that you've said so far qualifies for an arrest, does it? Well, at that point, no, Your Honor. But once there's an entry What qualifies, what establishes qualified immunity for the arrest here? Once the officer enters, he observes the daughter. She's crying and upset. She appeared to be somewhat distressed, shook up, possibly in trauma. These are things that the appellant does not dispute in terms of what the officer observed. He then questioned the daughter. Mrs. Pleasance interrupted and piped up to talk during the questioning. Just as she had tried to close the door previously, she's again trying to deny the officer an opportunity to Does that justify arrest at that point? Not at that point, but then What does justify arrest? Well, eventually, she responded that the daughter responded to the officer. My mom and I got into a fight. She uses those words. And that my mom hit me. She uses that word. She gestured that it was an open hand smack across her arm and her leg. And she says that she was grabbed by her wrists. And that's what the officer's told. What happened, the officer wasn't told anything about anything happening in a car or temper tantrums or anything like that. At that point, based on the child's condition, the fact that she's crying and bawling hysterically, and the fact that she has told the officer there was a fight and she's been hit and been grabbed, the officer then has probable cause to believe that an assault and battery against a family member has occurred under Virginia's statute. The other thing to consider, and the reason why this is Can I just ask one thing? Did the officer have any obligation to inquire into the circumstances? I think at the point in time that he has evaluated what's going on, he sees the daughter's upset and the daughter's using words like fight and hit and being grabbed. At that point, he has enough to make the arrest. But in terms of the qualified immunity analysis under the second prong, whether or not a clearly established right was violated, there's no evidence that there was, and the plaintiff hasn't pointed to any case law in that regard. 19.2-81.3 of the Virginia Code provides that warrantless arrests can occur when there's been an assault and battery against a family member. That's Virginia evincing a policy that we want these things, we want domestic-type situations to be resolved in a way that protects the victim. And if there's probable cause, the officer I'm not saying that. That doesn't reflect the policy. I mean, all it's saying is that there's authority to arrest. That's right. But a warrantless arrest without the officer having seen with his own two eyes what's happening is a little bit different. And Virginia's saying we're going to authorize a warrantless arrest even though the officer may not have seen exactly what happened. We're going to authorize it. And then if there's probable cause, he shall make the arrest. The appellant has made an argument that the officer should have known that this was corporal punishment. It was within, you know, what was defined as corporal punishment in Virginia. And there's really not a lot of law on that, Your Honors. The Carpenter case cited by the plaintiff talks about how parents, of course, are privileged in using corporal punishment to correct the ills of a growing child. And it uses terms like due moderation and things of that nature. Do you think an officer is entitled to arrest with the protection of qualified immunity any time a child indicates there's been corporal punishment? No, I do not, Your Honor, believe that that's the case just any time. But context matters. And where you have a child who, you know. And what are the two most critical factors in context to justify the officer to make an arrest in this case? Well, the mother has already shown that she, in the previous incident, it was reported to the officer that the child's being thrown out of the home. So there's some potential animus between the mother and the child as far as the officer is concerned based on the facts known to him. And then when he's there, the child, who's upset and crying hysterically and bawling, nonetheless tells the officer, I was hit and I was grabbed. And something. Wouldn't that be what a child could say any time the parents used allowable, what you would concede is allowable corporal, I'm not saying you concede in this case, but you concede to be allowable corporal punishment force. Your child could make those exact same statements and be crying, couldn't the child? Sure, they could, Your Honor. But the fact that this child has been a part of a situation between her parents in terms of custody and things like that, and it's been two times in a six-week period that the officers had to go out there to check on this child. That's the typical custody situation. I'm sorry? Why isn't that just a typical custody situation? These things happen all the time. And the parents try to use the criminal law process to gain leverage in their civil dispute. I mean, doesn't there have to be some evaluation? I don't think it's typical that a mother would throw her child out of the home and that it would appear to the officer that the child was being thrown out of the home or that at least it was. When you say thrown out of the home, what do you mean exactly factually? The November 1, 2009 incident, that's what was reported to the officer. And the circumstances of that, the court's already found, was something that the officer could interpret as an act of hostility and a desire to keep the child away from the father. And so then he comes back six weeks later and he's dispatched. The officer's not asking to come to this. He's dispatched. And, again, there's a report that the child's upset and crying and bawling hysterically. The officer comes. He tries to enter the home or he's there, knocks on the door. The mother answers and says, you and you leave. So he's not able to immediately assess the welfare. When he is and when he enters, he asks questions of the daughter and she says, I was hit and I was grabbed and she's crying and she's very upset about it. At that point in the context of all this, I think the officer was reasonable in believing that something more than just normal corporal punishment occurred. It's a tough position that the officer's placed in and I'm going to ask you, in my opinion, I'm going to ask you to assess it in light of what Judge Duncan said earlier, too, in light of what Judge Keenan said. You have situations, especially in custody matters, where children are in the middle of it and tug of war. And I suspect the case is the children play the parents, too. I'd rather be with you, Dad, because Mom is not a good person. You know what, sweetheart? I agree with you. What toy do you want now? I suspect that happens. But the point is, what is an officer to do when the officer, at least, there's some basis to believe this is not just the child reaching for a box of cereal in a grocery store. At that point, what does the law say to him when we have sort of competing interests? One is, maybe Paramount is protecting that child. That's right. Because it's not too hard to fathom a circumstance where the officer goes, gosh, I'm concerned, but I'm not going to arrest the mom, walks away, and you pick up the newspaper the next morning the child has been brutally injured. That's right. That's what the officer, I guess, is thinking about. So we're talking about what facts does the officer look to to make a decision that's reasonable under the circumstances and what do we look to to say we cannot say that's clearly illegal what you did? What do you say to that? Well, I say that the child's Maybe you say what I've been telling you, Judge. That is what I say. And I think Your Honor's picked up on this. The social cost of walking away and letting something bad happen is far worse than erring on the side of protecting the child, making the arrest because Virginia's code says if there's probable cause, you shall make the arrest. What corporal punishment is has not been defined with any level of particularity in Virginia. In fact, the case, the Carpenter case, says that words such as do and moderate and necessary as applied to chastisement are ever changing according to the ideas prevailing in our minds during the period and conditions in which we live. There's no guidance as to what's proper corporal punishment In the context of an officer trying to determine the welfare of this child who he's had to respond to, the home, and look after on two different occasions in a six-week period, it was proper for the officer to believe that he needed to protect the child, make the arrest, and let the criminal process work out. Could I ask how your legal analysis would proceed, assuming that if we were to agree with you, the district court said that ultimately it did not need to reach the question of whether defendant had probable cause to arrest. He exercised his discretion to analyze the second prong of the qualified immunity test first, focusing instead on whether defendant's conduct violated a clearly established constitutional right. Do you agree with what I'm asking is how would your legal analysis of this issue proceed? Well, I think it's what we've been talking about. I don't think it's clearly defined exactly what an assault and battery is versus what corporal punishment is under Virginia law. Under the second prong of that analysis, whether or not a clearly established right was violated, this court has said over and over again it's defined with a high level of particularity, particular to the circumstances. What about the two-step process of constitutional right established, and was there a clear violation of it? On the first question, I believe there was probable cause, and our brief outlines that. I understand that, but the district court did not reach that.  And so I'm asking about your analysis under the prong that determines whether or not a reasonable officer could have believed his actions to be lawful in light of clearly established law and the information that the officers possessed. The second prong is an easier question to answer, I think, and it makes sense. That's all that needs to be answered. And that's all that needs to be answered. That's exactly right. The question of whether or not a clearly established right was violated. Oh, I'm sorry. No, please, go ahead. I think that's a lot of what we've been talking about addresses that second prong and what is the status of assault and battery in Virginia law, what is the status of corporal punishment, what is an officer supposed to do when he's been to a residence. I just think it's nebulous enough at the time this officer acted that qualified immunity protects him as a district court. I think this case is exactly why the doctrine of qualified immunity exists, Your Honor. We hear that from a lot of lawyers who represent law enforcement officers. I'm sure that's right. But no bright line has been transgressed in this particular case. We thank you very much. We don't have any further questions. You've argued this in your brief. Is there anything else you care to add? I don't think so, Your Honor. All right. Thank you very much. Thank you. Thank you. And, Mr. Fogle, you've saved some time. A couple of points. Sure. Number one, I find it amazing that the claim that what happened on November 1st is somehow relevant to what happened on December 13th because, yes, Officer Rigsby was told by Mr. Pleasance that the mother was throwing the child out. But what happened when he got there was just the opposite. The mother wasn't throwing the child out. The mother didn't want the child to leave. Now, that meant one of two things. Either the father was lying about what the child said or the child was not telling the truth in order to convince her father to come over and pick her up and using, as Your Honor suggested, the parents against themselves. So I don't see how anything that happened on November 1st is of assistance in the analysis of probable cause or arguable probable cause. In fact, quite the contrary. It undermined the arguments that were being made by the husband that there was some attention needed to the child. Secondly, I think what the focus here has to be on what actually happened to this child. And it's not true that there's no case law. There is a lot of case law involving criminal cases, for the most part, that talk about child abuse. And I have read every one of them. And if you look at every one of them, the nature of the force that's used in those cases far, far, far, and I couldn't use enough fars, exceeds the kind of force that was used here. Which, again, as far as the record reveals, is a slap on the hand, as allegedly the mother was going to slap her on the knee, but her hand came down and slapped her on the hand. That's what happened in the car, and there was a reason for it. It wasn't just out of the blue, out of an unrequited passion on the mother's part. And secondly, what happened in the house, which we said in the complaint. The daughter refused to take a shower on a Sunday night before school. She grabs the daughter by the wrist and tries to pick her up and says, take a shower. The daughter pulls back. You'll recall the daughter is heavier than the mother. She pulls back from the mother, and that's the end of it. And that's the entire amount of force that's used in this case. And it's a far cry from anything in the case law, and it's a far cry from what anybody I think on the street would think would be an excessive amount of force by a parent. And if that's all the information that the officer had, and I'm not saying he shouldn't be concerned, but he has to reach a level of probable cause or arguable probable cause in order to actually effectuate an arrest, which is a pretty serious matter. And he didn't have that, and he had some other alternatives that he could have utilized. So I don't think that what he was told was reliable, but what's important, I think, is the nature of the force here was de minimis. And if we compare it to any of the case law here to here or in other states, when we compare it to the description of the Supreme Court of the right of a parent, I think it will be clear that this officer knew or should have known that this was de minimis force that was acceptable discipline under Virginia's law. Thank you. Thank you very much. Appreciate your argument here this morning. We'll step down and greet counsel, and then we'll go directly to the third case for this meeting.
judges: Dennis W. Shedd, Allyson K. Duncan, Barbara Milano Keenan